**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | | |
|---|---|---|
| **STEVEN LANDAU, on behalf of himself and all** | : | |
| **others similarly situated,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 16-2383** |
| | : | |
| **VIRIDIAN ENERGY PA LLC,** | : | |
| **Defendant.** | : | |

---

**MCHUGH, J.**                                                    **November 30, 2016**

<u>**MEMORANDUM**</u>

The deregulation of retail electricity markets in Pennsylvania and several other states has produced a large number of putative class actions alleging various unfair business practices, with mixed results.[1]  This is one such case.  Plaintiff Steven Landau claims that Defendant Viridian Energy PA LLC ("Viridian") lured him from his local utility company by making deceptive promises of low, stable electricity rates, in violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL).  Landau further alleges that Viridian breached the terms of its contract by charging him and others exorbitant prices for electricity.  Viridian now moves both to dismiss for failure to state a claim, relying in part on the "economic loss" doctrine,

---

[1] See, e.g., *Kantor v. Hiko Energy, LLC*, 100 F. Supp. 3d 421 (E.D. Pa. 2015); *Basile v. Stream Energy Pennsylvania, LLC*, No. 1:15-CV-01518, 2016 WL 4611443 (M.D. Pa. Sept. 6, 2016); *Mirkin v. Viridian Energy, Inc.*, No. 3:15-CV-1057 (SRU), 2016 WL 3661106 (D. Conn. July 5, 2016); *Daniyan v. Viridian Energy LLC*, No. CIV.A. GLR-14-2715, 2015 WL 4031752 (D. Md. June 30, 2015); *Zahn v. N. Am. Power & Gas, LLC*, No. 14 C 8370, 2015 WL 2455125 (N.D. Ill. May 22, 2015).  While analogous, these cases are ultimately of limited value because they address contractual provisions, legal theories, and factual allegations that are similar, but not identical, to those in the present case.

and to strike Landau's class allegations.  For the reasons detailed below, Viridian's Motion to Dismiss is granted in part and denied in part, but its Motion to Strike is denied.

## I.   Background

The facts are provided to the extent relevant to the motions.  All well-pleaded facts in Landau's complaint are taken as true pursuant to the standard of review on motions under Rule 12(b)(6).

In 2008, the Pennsylvania Legislature passed Act 129, opening Pennsylvania's energy markets to competition and allowing retail customers to purchase electricity from energy services companies (or "ESCOs") like Viridian, rather than from their local utility company.  Viridian is a Nevada limited liability company, registered in Pennsylvania as a foreign corporation.  It recruits customers in part through outreach by direct salespersons called "Independent Viridian Associates" ("Associates").  Compl. ¶ 29.

Sometime before July 18, 2013, two Associates met with Plaintiff Steven Landau and purportedly assured him that:

> Viridian was not like those other unethical companies out there, that if [Landau] signed up with Viridian he would enjoy lower rates than those offered by PECO [his local utility] . . . and that he would never have to worry about Defendant Viridian Energy suddenly increasing his rates.

Compl. ¶ 38.  In reliance on these representations and on various web-based advertisements that touted the affordability of Viridian's rates, Landau entered into a contract on or around July 18, 2013, to purchase electricity from Viridian.

The essential elements of Landau's contract with Viridian were as follows.  Viridian agreed to supply Landau with electricity, 20% of which would be generated from renewable sources.  In exchange, Landau agreed to pay a fixed rate of $0.0799 per kilowatt-hour (kWh) of electricity for a six-month period.  After this six-month, fixed-rate term of service, Landau could

either (1) cancel his Viridian service; (2) renew his service at a new fixed rate; or (3) do nothing, in which case his account would be transferred to Viridian's "Variable Price" plan.  MTD Ex. 4 at *1.

Landau's deal with Viridian was recorded in a two-page document labeled "Pennsylvania Terms & Conditions" (T & C), and a one-page "Welcome Letter."  The T & C reads like a standard retail services contract.  Among other things, it defines essential terms, provides the process by which parties can cancel the arrangement, and, most relevant to this case, includes two price disclaimers.  The first of these disclaimers states that "[u]nder Viridian's Variable Price, your price may fluctuate each month based on wholesale market conditions applicable to the DC's[2] service territory."  *Id.*  The second price disclaimer states that "Viridian's prices may be higher or lower than the DC's rate in any given month."  *Id.*

In style and substance, the T &C differs dramatically from the Welcome Letter.  The latter document memorializes the $0.0799 per kWh, six-month, fixed-rate arrangement, but otherwise reads like a marketing brochure rather than a contract.  The letter begins "You are on your way to enjoying affordable, green energy."  Compl. Ex. A.  Later, it describes the customer's "decision to choose a better energy supplier" as having "a positive environmental impact" that "directly contribute[s] to a better energy solution for our nation."  *Id.*  The Welcome Letter also promises that "from now on, you'll be doing your part to do something better for the environment while saving money on your energy costs at the same time."  *Id.*

Typically in these kinds of cases, the courtship exemplified by the Welcome Letter does not become part of the marriage vows between provider and consumer.  To the contrary,

---

[2] As explained elsewhere in the T & C, "DC" refers to the "Electric Distribution Company," the local utility that owns the wires over which Viridian distributes its electricity to its customers. PECO is Landau's DC.

promises made as part of the marketing are generally left out of the agreement itself, with an integration clause serving as a type of contractual "pre-nup," warning the customer that the sweet nothings of the sales force do not guarantee "happily ever after."  Remarkably, in this case, and of central relevance to my decision, the seductive   promises of the Welcome Letter were specifically incorporated into the contract itself.  According to the T & C, "This Disclosure Statement/Terms and Conditions, the Welcome Letter and the Enrollment Form create your agreement with Viridian (the 'Agreement') and supersede any oral or written statements made in connection with the Agreement or your Service."[3]  *Id.*

After the expiration of his six-month, fixed-rate term, Landau took no action to renew service under a new fixed rate agreement, nor did he terminate his arrangement with Viridian. Therefore, pursuant to the terms of the Agreement, in February 2014, Landau's account was transferred to the Variable Price plan.  As soon as this happened, Landau's rates more than doubled, jumping to $0.1749 per kWh, where they remained, with some minor variations, until Landau canceled his Viridian service in April 2015.  During the 15 months that Landau was a Variable Price customer, PECO's rates averaged only $0.0866 per kWh.

On these facts, Landau alleges that Viridian breached the terms of the Agreement (Count I) and breached the implied covenant of good faith and fair dealing (Count II).  Based on Viridian's alleged breach, Landau also seeks a declaration of the rights and obligations of the parties under the Agreement, pursuant to the Declaratory Judgment Act (DJA) (Count III). Landau further contends that Viridian engaged in deceptive business practices in violation of the UTPCPL (Count IV).  Finally, Landau brings an alternative claim of unjust enrichment in the event that its contract with Viridian is found to be invalid (Count V).

---

[3] Neither party has submitted the Enrollment Form as an exhibit.  My analysis is therefore limited to the language contained in the T & C and the Welcome Letter.

Landau brings this action on behalf of himself and similarly situated current and former Viridian customers.  Although Landau has not moved for class certification, he has signaled his intention to certify two classes, one under Rule 23(b)(2) and the other under Rule 23(b)(3).  Rule 23(b)(2) permits class certification where a defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Class certification under Rule 23(b)(3) is appropriate when "questions of law or fact common to class members predominate over any questions affecting only individual members" such that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Viridian now moves to dismiss Landau's claims, pursuant to Rule 12(b)(6).  In a separate motion, Viridian also moves to strike Landau's class allegations under Rules 12(f), 23(c)(1), and 23(d)(1)(D).

## II.   Standard of Review

### A.   <u>Motion to Dismiss</u>

A complaint is properly dismissed under Rule 12(b)(6) when it fails "to state claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In considering a 12(b)(6) motion, the court must first separate the factual and legal elements of a claim, accepting as true all well-pleaded facts while disregarding any legal conclusions.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  The court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

B.  Motion to Strike Class Allegations

In deciding a Rule 12(f) motion, the court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f). "Motions to strike are decided on the pleadings alone, and should not be granted unless the relevant insufficiency is 'clearly apparent.'"  *Hanover Ins. Co. v. Ryan*, 619 F. Supp. 2d 127, 132 (E.D. Pa. 2007) (quoting *Cipollone v. Liggett Group, Inc.,* 789 F.2d 181, 188 (3d Cir.1986)). "[M]otions to strike generally are disfavored. . . . Indeed, striking a pleading is a drastic remedy to be resorted to only when required for the purposes of justice and should be used sparingly." *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 428 (E.D. Pa. 2007).

**III.    Discussion**

A.  Motion to Dismiss

*a.  Breach of Contract (Count I)*

Under Pennsylvania law, "a plaintiff wishing to proceed with a breach of contract action must establish (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages."  *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003).  The parties agree that they entered into a binding contract.  The essential terms of the Agreement are spelled out in the T & C and the Welcome Letter.  The dispute here is whether Viridian breached a duty imposed by the Agreement.  There are flaws in the arguments advanced by both sides.

Landau's breach of contract allegation largely rests on the price disclaimer regarding Viridian's Variable Price plan, which reads:  "Under Viridian's Variable Price, your price may fluctuate each month based on wholesale market conditions applicable to the DC's service territory."  MTD Ex. 4 at *1.  Landau points to the large gap between Viridian's variable rate and

PECO's rates for the same time period.  Based on this discrepancy, he argues that Viridian "failed to base [its variable] rates upon market conditions despite [its] contractual obligation to do so."  Compl. ¶ 22.

There are two problems with this argument.  First, the Agreement provides that variable rates "may *fluctuate* each month based on wholesale market conditions," but it does not require Viridian to fix its variable rate at any particular level relative to wholesale market prices.  While Landau pleads facts showing that Viridian's variable rates were much higher than PECO's rates, this alone says nothing about why these rates changed from month to month.

Second, the Agreement provides that variable rates "may fluctuate each month based on *wholesale market conditions*," not based on PECO's rates.  Viridian notes, and Landau does not dispute, that a utility's retail rates for a given month may be determined by multiple factors other than contemporaneous wholesale market conditions.  For instance, when faced with rising prices in the wholesale electricity market, a utility may decide to shield retail customers from rate spikes by passing these costs along to customers incrementally over a period of several months.  *See* Reply at 4.  Because PECO's rates are not a true reflection of wholesale market conditions, Landau's comparison between PECO's rates and Viridian's rates does not show that Viridian's variable rates fluctuated based on anything other than wholesale market conditions.

Landau relies heavily on *Mirkin v. Viridian Energy, Inc.*, where a Connecticut District Court denied Viridian's motion to dismiss the plaintiff's breach of contract claim in a case involving virtually identical contract terms.  No. 3:15-CV-1057 (SRU), 2016 WL 3661106 (D. Conn. July 5, 2016).  There, as here, the contract at issue provided that:  "Your price may

7

fluctuate from month-to-month based on wholesale market conditions applicable to the LDU[4]

service territory."  2016 WL 3661106, at *3.  However, the plaintiffs in *Mirkin* based their

breach of contract claim on factual assertions about wholesale market prices, arguing that

"Viridian's rates increased or stayed the same even when the average wholesale market price for

the region decreased."  *Id*.  By contrast, Landau's only mention of wholesale market prices is his

unsupported claim that that Viridian's rates "bore no reasonable relationship to market

conditions."  Compl. ¶ 77.  Conclusory statements aside, Landau's allegations rest entirely on

PECO's rates which, as already noted, are not the same as wholesale market conditions.

In its defense, Viridian emphasizes the T&C's disclaimer that "Viridian's prices may be

higher or lower than the DC's in any given month."  MTD Ex. 4 at *1.  Seizing on this provision,

Viridian argues that a discrepancy between its rates and PECO's rates cannot have legal

significance because the Agreement gives Viridian *carte blanche* to set variable rates above

PECO rates.  The flaw in Viridian's claim of complete rate-setting discretion is that it is

inconsistent with the language of the Welcome Letter.  In relevant part, that document promises

that "You are on your way to enjoying *affordable, green energy*," and that "*from now on*, you'll

be doing your part to do something better for the environment while *saving money on your*

*energy costs* at the same time."  Compl. Ex. A (emphasis added).  Admittedly, the Welcome

Letter reads more like a marketing brochure than a contract document.  Nevertheless, the T & C

---

[4] LDU stands for "Local Distribution Utility."  *Mirkin*, 2016 WL 3661106, at *3.  The term
Local Distribution Utility appears to be synonymous with the term "Distribution Company" that
is used in the Agreement at issue here.

explicitly incorporates it into the fully integrated Agreement and I must therefore analyze it by applying principles of contract interpretation.[5]

"The fundamental rule in contract interpretation is to ascertain the intent of the parties." *Lesko v. Frankford Hosp.-Bucks Cty.*, 609 Pa. 115, 123, 15 A.3d 337, 342 (2011). Where the parties have entered into a written contract, "the intent of the parties is the writing itself." *Id.* In reading the contract, "all provisions . . . will be construed together and each will be given effect." *Id.* Consequently, I may "not interpret one provision of a contract in a manner which results in another portion being annulled." *Id.*

Contract disputes between consumers and companies often turn on "standard terms and conditions"— lawyerly phrases buried in a contract's carefully drafted fine print. No one actually believes that consumers read standard terms and conditions,[6] but the law nonetheless assumes that such terms manifest the intent of the parties. Here, I am faced with the opposite situation: Viridian itself has incorporated a set of decidedly un-lawyerly turns of phrase into its contract. Based on the Welcome Letter's informal tone and vague language, I question whether Viridian intended it to have legal effect. But it is not for me to decree that some sections of a contract reflect the parties' intent while others do not. Rather, I must read the Agreement in a way that gives all terms effect.

Though I cannot precisely define terms like "affordable," "green energy," and "saving money on your energy costs," I find that Landau pleads sufficient facts to support a claim that these terms were violated. According to Landau's complaint, during the 15 months that he

---

[5] The incorporation of the Welcome Letter as part of the Agreement appears to distinguish this case among the crowded field of putative class actions against Viridian and other ESCOs.

[6] *See* Restatement (Second) of Contracts § 211 cmt. b (1981) ("Customers do not in fact ordinarily understand or even read the standard terms.")

remained on Viridian's Variable Price plan, his rates were, on average, roughly 100% higher than PECO's rates.[7]  It might not be clear what "affordable" and "saving money" mean, but no reasonable construction of those terms could mean paying double.  The price disclaimers in the T&C empowered Viridian to charge more than PECO in any given month.  But to far exceed PECO's rate every single month for 15 months certainly violates the terms of the Welcome Letter.

Quantification of damages may prove problematic, but that is an issue for another day. For now, given Viridian's self-inflicted wound in the drafting of the contract, the Motion to Dismiss Count I is denied.

### b.   Breach of the covenant of good faith and fair dealing (Count II)

Landau cannot sustain a separate claim based on breach of the covenant of good faith and fair dealing because, under Pennsylvania law, there is no such independent cause of action.  *See Gallo v. PHH Mortg. Corp.*, 916 F. Supp. 2d 537. 551 (D.N.J. 2012).  Rather, courts applying Pennsylvania law read "a claim predicated on a breach of the covenant of good faith [as] 'subsumed in a breach of contract action.'"  *Kantor*, 100 F. Supp. 3d at 430 (quoting *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013)).  Stated differently, "a breach of such covenant *is* a breach of contract action."  *Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*, 779 F. Supp. 2d 416, 418 n.8 (E.D. Pa. 2011) (emphasis added).

Here, Landau's implied covenant claim is a nearly word-for-word restatement of his breach of contract claim, and I read it as wholly incorporated within Count I.  Accordingly, Viridian's Motion to Dismiss Count II is granted.

---

[7] The Complaint repeatedly refers to an average increase of just under 50%; this appears to be an arithmetic error, understating Plaintiff's losses.  On a monthly basis, Landau's Viridian rate exceeded the corresponding PECO rate by as much as 118% and never less than 73%.

*c.   Alternative Claim for Unjust Enrichment (Count V)*

Under Pennsylvania law, a plaintiff "may plead breach of contract and unjust enrichment claims in the alternative only where an express contract cannot be proven." *Gallo*, 916 F. Supp. 2d at 553 (quoting *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 (Pa. Super. Ct. 2009).  Thus, courts allow unjust enrichment claims to proceed in breach of contract actions "where there is a question as to the validity of the contract in question," *Montanez v. HSBC Mortg. Corp. (USA)*, 876 F. Supp. 2d 504, 516 (E.D. Pa. 2012).  If no dispute exists as to whether an enforceable contract exists, then plaintiffs are barred from bringing unjust enrichment claims.

Here, the parties acknowledge the existence of a legally binding, valid contract. Viridian's Motion to Dismiss Count V is therefore granted.

*d.   Unfair Trade Practices and Consumer Protection Law (Count IV)*

In Count IV, Landau alleges that Viridian's marketing activities violated the UTPCPL, 73 Pa. Stat. Ann. and Cons. Stat. §§ 201-1 *et seq.*  Before reaching the substance of Landau's UTPCPL claim, I must first decide whether that claim is barred by the economic loss doctrine, as Viridian argues.

In general, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract."  *Duquense Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995).  In *Werwinski v. Ford Motor Co.*, the Third Circuit, predicting how the Pennsylvania Supreme Court would rule, held that the economic loss doctrine applies to statutory fraud claims, including those arising under the UTPCPL.  286 F.3d 661 (3d Cir. 2002).  At the time *Werwinski* was decided, no Pennsylvania appellate court had yet considered whether the economic loss doctrine barred UTPCPL claims

that flowed from a breach of contract.  The Superior Court of Pennsylvania has since disagreed with *Werwinski*, holding in *Knight v. Springfield Hyundai* that the economic loss doctrine barred only "'cause[s] of action in **negligence** that result[] solely in economic damages unaccompanied by physical injury or property damage[s].'"  81 A.3d 940, 952 (Pa. Super. Ct. 2013) (emphasis in original) (*quoting Excavation Tech., Inc. v. Columbia Gas Co. of Pa.*, 604 Pa. 50, 53 n.3, 985 A.2d 840, 841 n.3 (2009) (Donohue, J).   Thus, the *Knight* court found that when claims are brought "pursuant to the UTPCPL [] and do not sound in negligence[,] . . . the economic loss doctrine is inapplicable."  *Id.*

Whether Landau's UTPCPL claims are barred under the economic loss doctrine depends on whether *Werwinski* still controls after the Superior Court's decision in *Knight*.  District courts in Pennsylvania are divided on this question.  Some have held that *Werwinski* no longer is controlling authority and have followed *Knight* in ruling the doctrine inapplicable to claims brought under the UTPCPL.  *Kantor*, 100 F. Supp. 3d at 427; *Roberts v. NVR, Inc.,* No. 15-489, 2015 WL 3745178, at *5 (W.D. Pa. June 15, 2015); *Horne v. Progressive Advanced Ins. Co.*, No. 15-1029, 2015 WL 1875970, at *1 n.1 (E.D. Pa. Apr. 24, 2015).  Other courts have held that *Werwinski*'s prediction of the Pennsylvania Supreme Court's ruling on the economic loss doctrine remains binding.  *McGuckin v. Allstate Fire & Cas. Ins. Co.,* No. 15-2173, 2015 WL 4579028, at *3 (E.D. Pa. July 30, 2015); *Vaughan v. State Farm Fire & Cas. Co.,* No. 14-1684, 2014 WL 6865896, at *4 n.6 (E.D. Pa. Dec. 3, 2014); *Pesotine v. Liberty Mut. Grp., Inc.,* No. 3:14-CV-784, 2014 WL 4215535, at *4 n.1 (M.D. Pa. Aug. 25, 2014); *Gadley v. Ellis,* No. 13-17, 2014 WL 3696209, at *4–5 (W.D. Pa. July 23, 2014); *see also Abraham v. Ocwen Loan Servicing, LLC,* No. 14-4977, 2014 WL 5795600, at *7 n.3 (E.D. Pa. Nov. 7, 2014) (stating that *Werwinski* remains the binding law of the Third Circuit); *Moore v. State Farm Fire & Cas. Co.*,

No. 14-3113, 2015 WL 463943, at *2 (E.D. Pa. Feb. 4, 2015) (applying *Werwinski* after *Knight*);
*Zeglen v. Nw. Mut. Life Ins. Co.,* No. 14-173, 2014 WL 4215531, at *4 (M.D. Pa. Aug. 25, 2014)
(same).

Viridian quotes extensively from *Whitaker v. Herr Foods, Inc.*, where the court noted that
under the Third Circuit's Internal Operating Procedure (IOP) 9.1, a panel's precedential decision
is binding on subsequent panels "unless a U.S. Supreme Court decision requires modification or
the Third Circuit sitting *en banc* overrules the prior decision."  ___ F. Supp. 3d ___, No. CV 16-
2017, 2016 WL 4060127, at *8 (E.D. Pa. July 29, 2016) (citing *Horsey v. Mack Trucks, Inc.*, 882
F.2d 844 (3d Cir. 1989)).  In refusing to abandon *Werwinski*, the *Whitaker* court found it
"axiomatic that if another panel of the Court of Appeals for the Third Circuit is bound by a
previous panel's construction of state law then district courts within the Third Circuit are also
bound by that construction."  *Id.* at *9 (quoting *Maxwell Stepanuk, Jr., D.O., P.C. v. State Farm
Mut. Auto. Ins. Co.*, No. CIV. A. 92-6095, 1995 WL 553010, at *2 (E.D. Pa. Sept. 19, 1995)).

I am not as convinced that the concerns addressed by the Third Circuit's internal rule
necessarily resolve the question before me.  IOP 9.1 is the court's formulation of what is
generally referred to as the "coordinate jurisdiction" rule—the principle that one judge of equal
rank may not overrule another.  Among the well-established exceptions to that prohibition is
where there has been an intervening change in the law.  *In re Pharmacy Benefit Managers
Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009).  That is precisely the case here.  After
*Werwinski*, unanimous panels of the Superior Court have twice refused to apply the economic
loss doctrine in UTPCPL cases, first in *Knight* and more recently in *Dixon v. Northwestern
Mutual*, 146 A.3d 780 (Pa. Super. 2016) (Olsen, J.).  In *Dixon*, the court cited a decision from
Judge R. Stanton Wettick, one of Pennsylvania's most respected jurists, to the effect that

13

application of the economic loss doctrine to the UTPCPL would render the UTPCPL's catch-all provision meaningless. *Dixon*, 146 A.3d at 790 (citing *Toth v. Nw. Sav. Bank*, No. GD-12-008014, 2013 WL 8538695, at *16 (Pa. Com. Pl. Mar. 1, 2013)).  In short, six appellate judges in Pennsylvania and a highly regarded trial judge have rejected *Werwinski* as a proper statement of Pennsylvania law.

The Third Circuit itself has recognized the limited reach of IOP 9.1 in cases such as this.

In *Debiec v. Cabot Corp.*, the court described the binding force of predictive precedent this way:

> [I]n the absence of a clear statement by the Pennsylvania Supreme Court to the contrary *or other persuasive evidence* of a change in Pennsylvania law, we are bound by the holdings of previous panels of this court.

352 F.3d 117, 131 (3d Cir. 2003) (emphasis added).  This qualification to IOP 9.1 was underscored in *Robinson v. Jiffy Executive Limousine Co.*, where the court held that:

> Internal Operating Procedure 9.1 reflects our tradition that reported panel decisions are binding on subsequent panels, and *in banc* consideration is required before overruling such decisions.  However, when we are applying state law and there is persuasive evidence that it has undergone a change, *we are not bound by our previous panel decision if it reflected our reliance on state law prior to its modification.*

4 F.3d 237, 239–40 (3d Cir. 1993) (emphasis added).

*Robinson* is highly relevant to this case.  At issue there was the vitality of a Third Circuit panel's prediction of New Jersey law in light of two contrary rulings issued later by the Appellate Division of New Jersey Superior Court.[8]  While acknowledging that "state intermediate appellate decisions are not automatically controlling where the highest court of the

---

[8] The specific issue in *Robinson* was whether a hiring entity could be found liable for negligence if it contracted with "a financially incompetent independent contractor."  4 F.3d at 240.  The Third Circuit had originally predicted that the New Jersey Supreme Court would hold hiring entities liable, but withdrew that prediction once later decisions of the Superior Court held otherwise.  *Id.* at 240–41.

state has not spoken," the *Robinson* court cautioned that federal courts sitting in diversity "must give serious consideration to the decisions of the intermediate appellate courts in ascertaining and applying state law." *Id*. at 242.  In so doing, the court concluded that the New Jersey appellate court's decisions constituted persuasive evidence of a change in state law which nullified the Third Circuit's earlier prediction despite IOP 9.1.

*Robinson*'s reliance upon decisions from intermediate appellate courts has additional force in light of other decisions from the Third Circuit.  In *Gares v. Willingboro Township*, it held that "in the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." 90 F.3d 720, 725 (3d Cir. 1996).  And in *U.S. Underwriters Insurance Co. v. Liberty Mutual Insurance Co.*, the circuit observed that "the rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent a persuasive indication that the highest state court would rule otherwise."  80 F.3d 90, 93 (3d Cir. 1996).

The rejection of *Werwinski* by Pennsylvania appellate courts counsels a further look at the analytical strength of *Wersinski* itself.  Preliminarily, it is noteworthy that the *Werwinski* court did not have the benefit of any Pennsylvania decisions directly addressing the applicability of the economic loss doctrine to the UTPCPL.  *Robinson* implicitly recognizes that federal courts make predictions out of necessity:  some rule must govern every pending case.  But when federal judges are forced by circumstance to divine a path in the absence of meaningful precedent from the state courts, the exercise is by its very nature as much speculation as it is prediction, properly subject to re-evaluation in the face of new developments.  As to the precise issue before it, the panel in *Werwinski* was painting on a blank canvas, forced to look to other jurisdictions.  In light of *Robinson*, that alone should give pause because the intermediate appellate courts of

15

Pennsylvania have twice rejected *Werwinski*.  Beyond that, there is reason to be concerned about applying a judicially created doctrine to eviscerate the language of a statute.

The courts that created the economic loss doctrine were concerned about the scope of tort liability, specifically, whether the broad precepts of negligence, and even broader precepts of strict liability—meant to facilitate recovery for *physical* injury—should extend to claims where the only harm suffered by the plaintiff was to property or pocketbook.  Jean Braucher, *Deception, Economic Loss and Mass-Market Customers: Consumer Protection Statutes as Persuasive Authority in the Common Law of Fraud*, 48 Ariz. L. Rev. 829, 835–36 (2006).  At common law, recovery for purely economic loss was limited to the realm of contract, and the economic loss doctrine served to maintain and reinforce the traditional distinction between contract and tort.  Stated differently, the economic loss doctrine was a common law rule created as a limitation upon common law causes of action.  The UTPCPL, in contrast, represents the **legislative** creation of a remedy that explicitly goes beyond[9] the traditional measure of the common law by authorizing judges to award "up to three times actual damages sustained," to "provide such additional relief as it deems necessary or proper," and to award "costs and reasonable attorneys' fees."  73 Pa. Stat. Ann. and Cons. Stat. § 201-9.2.  The Superior Court's decision in *Knight*, limiting application of the economic loss doctrine to common law tort claims, appropriately recognizes that such a judicially created limitation cannot simply be engrafted onto a statute.

That same distinction was recognized by Judge Van Antwerpen, then a member of this court, when he noted that by allowing recovery in excess if actual losses, the UTPCPL is a statute "in derogation of common law."  *O'Keefe v. Mercedes-Benz, USA, LLC*, 214  F.R.D. 266,

---

[9] As to any common law claim, outside the realm of punitive damages, a plaintiff's recovery— whether tort or contract—can never exceed actual loss, and counsel fees are not recoverable.

275 (E.D. Pa. 2003).  Traditionally, courts have strictly construed such statutes, but under

Pennsylvania's Statutory Construction Act, they are explicitly prohibited from applying common

law in a way that frustrates legislative intent and undermines a statute.  1 Pa. Stat. and Cons. Stat.

Ann. § 1928(a).  In fact, the Pennsylvania Supreme Court explicitly recognized the breadth of the

UTPCPL shortly after its enactment:

> The Legislature sought by the Consumer Protection Law to benefit the public at
> large by eradicating, among other things, "unfair or deceptive" business practices.
> . . . Since the Consumer Protection Law was in relevant part designed to thwart
> fraud in the statutory sense, it is to be construed liberally to effect its object of
> preventing unfair or deceptive practices.

*Commonwealth  v. Monumental Properties, Inc.*, 459 Pa. 450, 457–58, 329 A.2d 812, 815

(1974).

The Supreme Court's construction of statutory intent makes clear that the legislature's

goal was to reach beyond simply compensating consumers for losses, which is the focus of the

common law, to deter unscrupulous business practices.  Application of the economic loss

doctrine is flatly inconsistent with that legislative goal.  As Judge Van Antwerpen further pointed

out, Pennsylvania trial and appellate courts, both before and after *Wersinski*, repeatedly

permitted enhanced damages under the statute, notwithstanding the economic loss doctrine.

*O'Keefe*, 214 F.R.D. at 276–77.  In short, the uniform practice of the Pennsylvania courts had

been to ignore the economic loss doctrine in their application of the UTPCPL even before the

doctrine's formal rejection by two separate panels of the Superior Court.

There is certainly wisdom to the proposition that a district judge should wait for

definitive guidance from the circuit before presuming that a decision from the circuit has lost

vitality.[10]  But such caution comes with a price.  The current divergence between the federal and

state courts, specifically referenced by the Superior Court in *Dixon*, 146 A.3d at 790 n.12, means

that the outcome of a case is currently a function of forum.  This is problematic because the

Third Circuit has also cautioned that "in all cases where a federal court is exercising jurisdiction

solely because of the diversity of citizenship of the parties, the outcome of the litigation in the

federal court [should] be substantially the same, so far as legal rules determine the outcome of a

litigation, as it would be if tried in a State court."  *Chamberlain v. Giampapa*, 210 F.3d 154,

158–59 (3d Cir. 2000) (quoting *Guar. Trust Co. v. York*, 326 U.S. 99, 109 (1945).  *See also*

*Edelson v. Soricelli*, 610 F.2d 131, 134 (3d Cir. 1979) ("[A] fundamental notion underlying *Erie*

is that a federal court sitting in diversity merely provides an impartial forum, not a different set

of legal rules."); *Stoner v. Presbyterian Univ. Hosp.*, 609 F.2d 109, 111 (3d Cir. 1979) ("The

fortuity of diverse citizenship should not subject a litigant to legal burdens different from those

that a state court would impose.").  Continued application of *Werwinski* in the face of its

universal rejection by Pennsylvania courts raises a serious issue of federalism.

  Blind adherence to predictive precedent is also problematic because of the difficulty

inherent in the task of prediction.  *Paynton v. Spuds, LLC*, CIV.A. 13-6373, 2014 WL 3353248,

(E.D. Pa. July 9, 2014).  As one illustration, the Court of Appeals twice predicted that

Pennsylvania would adopt Sections 1 and 2 of the Restatement (Third) on Product Liability.  *See*

*Covell v. Bell Sports, Inc.*, 651 F.3d 357, 363–64 (3d Cir. 2011); *Berrier v. Simplicity Mfg., Inc.*,

563 F.3d 38, 45 (3d Cir. 2009).  It continued to direct district court judges to apply the Third

---

[10] In *O'Keefe*, Judge Van Antwerpen did not have decisions subsequent from the Pennsylvania
Superior Court to justify his conclusion.  He simply refused to follow *Wersinski*.  That defiance
of the judicial chain-of-command did not prevent him from being elevated to a seat on the Court
of Appeals the following year.  In another historical irony, counsel for plaintiff giving force to
the attack on *Wersinski* was Arlin Adams, who had served on the Third Circuit for 18
distinguished years.

Restatement even after the Pennsylvania Supreme Court passed on the opportunity to adopt it in two cases. *Sikkelee v. Precision Airmotive Corp.*, No. 12-8081, 2012 WL 5077571 (3d Cir. Oct. 17, 2012). Ultimately, of course, the Pennsylvania Supreme Court rejected the Third Restatement. *Tincher v. Omega Flex*, ___ Pa. ___, 104 A.3d 328 (2014). In the meantime, litigants whose cases were removed to federal court had them resolved by substantive principles that did not comport with Pennsylvania law.

In light of *Robinson* and the Third Circuit's general caution that forum should not control the applicable law, now that the Superior Court has twice rejected *Werwinski*, I refuse to dismiss the UTPCPL claim on the basis of the economic loss doctrine, and will consider its substance.

"The UTPCPL is Pennsylvania's consumer protection law and seeks to prevent unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Bennett v. A.T. Masterpiece Homes*, 40 A.3d 145, 151 (Pa. Super. Ct. 2012). The law creates a cause of action for

> [a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by this act[.]

73 Pa. Stat. Ann. and Cons. Stat. § 201-9.2. Section 201-2(4)(i)-(xx) lists 20 specific types of unlawful conduct, while § 201-2(4)(xxi) contains a catch-all provision that bans "any fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

The factual basis for Landau's UTPCPL claim is two-fold.[11] First, Landau avers that:

---

[11] It is unclear if Landau also wishes to press a UTPCPL claim based on the language contained in the Agreement. In his Response to Viridian's Motion to Dismiss, Landau distinguishes his UTPCPL claim from his breach of contract claim, stating that "Plaintiff's UTPCPL claim does not hinge upon the language in the contract nor does the legitimacy of the UTPCPL claim require an analysis or interpretation of the contract." Resp. at 18. However, later in the same document, Landau seems to reverse himself: "Plaintiff's [UTPCPL] claims are centered on Viridian's

> Prior to signing up with Defendant Viridian Energy, [he] was assured by two Viridian Associates that Viridian was not like those other unethical companies out there, that if he signed up with Viridian he would enjoy lower rates than those offered by PECO . . . and that he would never have to worry about Defendant Viridian Energy suddenly increasing his rates.

Compl. ¶ 38. Second, Landau cites nine instances of what he characterizes as misleading online advertising. Each of the cited passages touts Viridian's product as "responsible" or "green" energy that is also "affordable" or that will not "hurt your pocketbook." Compl. ¶¶ 14–20; 23, 29. The following passage is representative of the other eight in Landau's Complaint: "With Viridian, it's easy to choose affordable, responsible energy for your home or business[.]" Compl. ¶ 20.

Viridian argues that Count IV must be dismissed because Landau's UTPCPL claim: (1) is based on statements that were mere non-actionable puffery; (2) sounds in fraud and is not pleaded with sufficient particularity; (3) fails to establish the elements of a deception claim under the UTPCPL; and (4) is barred by a "regulatory compliance defense." Finally, Viridian argues that Landau lacks standing to assert a claim for injunctive relief under the UTPCPL. I consider each argument in turn.

### i.   Reliance on Non-actionable Puffery

The Third Circuit has described puffery as "exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993). Puffery is distinguishable from actionable "misdescriptions or false representations of specific characteristics of a product" that are subject to measurement and are therefore testable. *Id.*

---

Terms and Conditions and Welcome Letter." *Id.* at 24. Unsure of how to reconcile these seemingly contradictory statements, I focus my analysis of Landau's UTPCPL claim on his pre-contract interactions with Viridian.

I agree with Viridian that the online advertisements cited by Landau constitute non-actionable puffery.  Although the language in Viridian's online marketing claims is nearly identical to the language in its Welcome Letter, the Welcome Letter formed a part of the Agreement and was therefore subject to analysis under the principles of contract interpretation.  I was bound to give effect to each section of the Agreement, but I am under no corresponding obligation to hold Viridian to the statements that it makes in its online advertisements.

In other actions against Viridian and companies like it, courts have been asked to consider the legal significance of advertisements that made similarly vague promises of cost savings and competitive rates.  Regardless of whether these courts allowed cases to proceed to discovery or dismissed them at the pleading stage, no court has found that such broadly worded claims of affordability were actionable on their own.  *See*, *e.g.*, *Mirkin*, 2016 WL 3661106, at *6 ("The statements that Viridian will allow customers to 'save money' or that it will offer 'competitive' rates are too vague to be actionable."); *Daniyan v. Viridian Energy LLC*, 2015 WL 4031752, at *2 ("Viridian's generalized statements that its energy is competitively priced and often costs less than the utility's rates amount to nothing more than vague generalities and puffery").  In the context of online advertisements, I too find that Viridian's vague descriptions of its product were mere puffery and therefore cannot support a claim under the UTPCPL.[12]

Though Viridian's online marketing was non-actionable puffery, the alleged statements of its Associates were not.  Claims that Viridian's rates would remain stable and be lower than PECO's rates were not generalized claims, nor were they mere "'sales talk' offered and understood as an expression of the seller's opinion only."  *Castrol*, 987 F.2d at 945.  Rather, the

---

[12] I recognize the inherent tension in rejecting these statements for purposes of the UTPCPL claim while recognizing them as part of the contract.  But that was Viridian's choice.  The legal problems presented by the vague nature of such contractual language will be addressed another day.

Associates' alleged statements were measurable factual assertions about Viridian's product.  *See*

*Mirkin*, 2016 WL 3661106, at *6 (finding a claim that "the average" Viridian customer "saves

money on energy costs over time" was actionable because it was "clearly susceptible to

quantification" and "can be verified by statistical analysis").  A salesperson may be entitled to

"lie his head off, so long as he say nothing specific," but the law recognizes that reasonable

consumers are likely to be misled by specific assurances concerning the nature of a product or

service.  *Castrol*, 987 F.2d at 945.  Viridian's attempt to dismiss Landau's UTPCPL claim as

based on non-actionable puffery therefore fails.

*ii.     Failure to Plead Fraud Claims with Particularity*

Viridian next argues that Landau's UTPCPL claim sounds in fraud and therefore must be

dismissed for failure to comply with the heightened pleading requirements of Federal Rule of

Civil Procedure 9(b).  Viridian's argument mischaracterizes the law.  As discussed below, the

UTPCPL allows claims for "fraud" or "deception," and claims based on deception need only

satisfy the normal pleading standard set forth in Rule 8(a).

Landau does not state in his Complaint which provision of the UTPCPL he is suing

under,[13] but I find that his claim most plausibly fits within the UTPCPL's catch-all provision,

---

[13] Viridian maintains that Landau's UTPCPL claim should be dismissed because he does not
specify the section of the UTPCPL under which his claim arises.  In support of this novel
pleading rule, Viridian cites three cases.  Its first two cases—*Taggart v. Franconia Township*,
No. CIV.A. 10-2725, 2011 WL 1399802 (E.D. Pa. Apr. 12, 2011), and *Loften v. Diolosa*, No.
CIV. A. 3:CV-05-1193, 2008 WL 2994823 (M.D. Pa. July 31, 2008)—are clearly
distinguishable in that both concerned complaints so lacking in specificity that the defendants
had no way of knowing the factual bases for the plaintiffs' suits.  By contrast, here, Landau's
Complaint gives Viridian ample notice of the alleged misconduct on which his claim rests.
Viridian's third case, *Connolly v. Reliastar Life Ins. Co.*, is even less helpful to its argument.  No.
CIV.A.03-5444, 2006 WL 3355184 (E.D. Pa. Nov. 13, 2006).  There, as here, the plaintiff "did
not identify which provisions of Section 201-2(4) Defendants allegedly violated."  *Id.* at *11.

which prohibits "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 Pa. Stat. and Cons. Stat. Ann. § 201-2(4)(xxi).[14]

The current version of the catch-all provision barring "fraudulent or deceptive conduct" dates back to 1996.  Before that, the catch-all provision only applied to "fraudulent conduct." Based on that precise statutory language, courts required claims arising under the pre-1996 catch-all provision to satisfy the elements of common law fraud.  *See*, *e.g.*, *Prime Meats, Inc. v. Yochim*, 619 A.2d 769, 773 (Pa. Super. Ct. 1993), *appeal denied*, 538 Pa. 627, 646 A.2d 1180 (1994) (holding that plaintiffs must prove elements of common law fraud to recover under the UTPCPL's catch-all provision because that provision forbids only "fraudulent" conduct). Claims arising under the pre-1996 catch-all provision were also subject to Rule 9(b), which requires that fraud be pled with particularity, "with all of the essential background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where, and how' of the events at issue."  *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citation omitted).

In 1996, the Pennsylvania legislature expanded the UTPCPL's catch-all provision by adding "deceptive conduct."  Courts struggled for well over a decade to interpret this change in statute.  Uncertainty over the significance of the phrase "deceptive conduct" led to a line cases that effectively ignored the 1996 amendments by continuing to require claims under the catch-all

---

However, rather than dismissing the complaint, as Viridian urges now, the court found that it "must . . . first review [the] allegations and then decide if Section 201-2(4) reaches them."  *Id.*

[14] While Landau's Complaint does not specify what section of the UTPCPL he is suing under, it is clear that his suit is based on an alleged violation of the UTPCPL.  For this reason, I reject Viridian's attempt to characterize Landau's claim as an action for common law fraudulent concealment, which must rest on a duty to disclose.

provision to satisfy the elements of common law fraud.  *See Bennett*, 40 A.3d at 151–53

(discussing the history of the 1996 UTPCPL amendments and its treatment by the courts).

More recently, both state and federal courts have acknowledged that the addition of the

term "deceptive conduct" has legal significance.  *See Id.* (discussing cases).  As the Superior

Court recognized in *Bennett*, the practice of treating "deception" claims as common law fraud

claims has fallen out of favor.  Today, the vast weight of authority in Pennsylvania holds that a

plaintiff can state a claim under the catch-all provision by pleading facts sufficient to support a

claim for fraud or deception.  *See*, *e.g.*, *id.*; *Fazio v. Guardian Life Ins. Co. of Am.*, 62 A.3d 396,

405 (Pa. Super. Ct. 2012); *Slemmer v. McGlaughlin Spray Foam Insulation*, 955 F. Supp. 2d

452, 463 (E.D. Pa. 2013); *Schnell v. Bank of N.Y. Mellon*, 828 F. Supp. 2d 798, 807 (E.D. Pa.

2011); *Vassalotti v. Wells Fargo Bank, N.A.*, 732 F. Supp. 2d 503, 510 (E.D. Pa. 2010).  Unlike

fraud claims, deception claims are not subject to Rule 9(b) and need only comply with the

pleading requirements imposed by Rule 8(a).  *Slemmer*, 955 F. Supp. 2d at 463.

Because plaintiffs can bring claims for fraud **or** deception under the UTPCPL's catch-all

provision, and because deception claims need only meet the normal pleading standard set forth

under Rule 8(a), Viridian's argument that Landau's claim must be dismissed for failure to plead

fraud with particularity fails.

> iii.   *Required Elements of a Deception Claim Under the UTPCPL's*
>        *Catch-All Provision*

The elements of a deception claim are:  (1) "a deceptive act," meaning "conduct that is

likely to deceive a consumer acting reasonable under similar circumstances"; (2) "justifiable

reliance [based on] the defendants' misrepresentation or deceptive conduct"; and (3) an

"ascertainable loss" caused by this justifiable reliance.  *Vassalotti*, 732 F. Supp. 2d at 510–11

(citation omitted).

Regarding the first element, Viridian argues that Landau cannot have been misled by its Associates' promises of low, stable rates because the T & C provides that variable rates "may fluctuate each month based on wholesale market conditions" and that "Viridian's prices may be higher or lower than the DC's in any given month."  MTD Ex. 4 at *1.  I am unpersuaded by this argument.  Drawing all inferences in favor of Landau, the statement that Landau "would enjoy lower rates than those offered by PECO," Compl. ¶ 38, can be reasonably interpreted as an assurance that Viridian's *average* rate would be lower than PECO's *average* rate.  Understood in this way, the Associates' statements are not contradicted by the disclaimer that "Viridian's prices may be higher or lower than the DC's in any given month."  MTD Ex. 4 at *1.  Rather, a reasonable consumer in Landau's position could have harmonized the two statements by assuming that his Viridian rate might occasionally exceed PECO's rate but that, on balance, he would save money as a Viridian customer.

Admittedly, the promise that "[Landau] would never have to worry about [Viridian] suddenly increasing his rates," Compl. ¶ 38, is inconsistent with the warning that "rates may fluctuate from month to month," MTD Ex. 4 at *1, but I find it deceptive for Viridian to make bold assurances and then hide behind fine print disclaimers.  This kind of bait-and-switch marketing is particularly misleading here because the Agreement also refers to "affordable, green energy" and promises that "from now on," customers will "sav[e] money on [their] energy costs."  Compl. Ex. A.  Thus, even assuming that Landau carefully studied the T & C, the language of the Welcome Letter, also a part of the contract, would reasonably lull him into discounting the force of the disclaimers on which Viridian now relies.

In short, because the Agreement did not adequately correct the Associates' misleading statements, I find that a reasonable consumer in Landau's position would likely have been deceived.

Turning to the element of justifiable reliance, Viridian maintains that Landau's complaint presents "a threadbare recital of the justifiable reliance element" of his UTPCPL claim, which "does not pass muster under *Iqbal* or its progeny."  MTD at 24.  This argument completely ignores sections of Landau's Complaint in which he pleads facts supporting his claim of reliance. Specifically, Landau avers that, "[p]rior to signing up with Defendant Viridian Energy," two Associates promised him that Viridian's rates were lower than PECO's rates and would not increase suddenly.  Compl. ¶ 38.  Moreover, Landau maintains that he "would not have enrolled in [Viridian's] program but for Defendant's promises of savings and rates competitive with the market."  Compl. ¶ 45.  At the pleading stage, I find these factual allegations sufficient to establish the element of reliance.  Furthermore, as discussed in reference to Viridian's puffery defense, I find that a reasonable consumer in Landau's position would have been misled by the Associates' promises of low, stable rates; I therefore conclude that Landau has pled facts that support a reasonable inference of justifiable reliance.

Finally, Landau's Complaint makes out a clear claim for ascertainable loss as required under the UTPCPL's catch-all provision.  Landau contends that Viridian's deceptive sales practices lured him from PECO.  Therefore, the measure of Landau's loss is the difference between what he paid as a Viridian customer and what he would have paid had he remained with PECO.  This loss should be readily ascertainable by multiplying Landau's monthly electricity consumption as a Viridian customer by the monthly rates for PECO and Viridian, respectively, and then comparing the resulting products.

iv.        *Regulatory Compliance Defense*

Viridian next asserts a "regulatory compliance defense."  MTD at 29.  According to Viridian, this defense functions as a sort of preemption doctrine that defeats UTPCPL claims "where federal or state regulators have approved the conduct or documents that form the basis for a plaintiff's claim."  *Id.*  In fact, no such defense exists in Pennsylvania, and even if it did, it would not help Viridian here.

Viridian's fanciful defense rests on a misreading of three insurance cases:  *Fisher v. Aetna Life Ins. & Annuity Co.*, 39 F. Supp. 2d 508 (M.D. Pa. 1998); *Grudkowski v. Foremost Ins. Co.*, No. 3:CV-12-1847, 2013 WL 816666 (M.D. Pa. Mar. 5, 2013); and *Fay v. Erie Ins. Grp.*, 723 A.2d 712 (Pa. Super. Ct. 1999).  All three of those cases concerned disputes over policies that had previously been approved by the Insurance Commissioner.  However, contrary to Viridian's argument, none of those cases turned on the Commissioner's prior approval of the challenged policies.  Rather, in each case, the court rejected the UTPCPL claims for reasons that were unrelated to the defendant's compliance with governing regulations.  Only the *Fay* and *Grudkowski* opinions even discuss the significance of the defendants' regulatory compliance, and in both cases, this discussion was *dicta* justifying on public policy grounds a set of seemingly unfair results.  *See Fay*, 723 A.2d at 715; *Grudkowski*, 2013 WL 816666, at *11–12.

Not only is Viridian's "regulatory compliance defense" without precedential support, but it has no bearing here.  Landau alleges that Viridian's Associates made false or misleading statements in violation of the UTPCPL's catch-all provision.  Viridian does not argue that these statements were approved by the Public Utilities Commission, so it is unclear why the purported safe harbor of regulatory compliance would defeat Landau's claim.

27

>           *v.*        *Injunctive relief*

As part of his UTPCPL claim, Landau seeks an injunction to prevent Viridian's "unlawful practice of charging excessive undisclosed rates to its customers." Compl. ¶ 82. Viridian argues that Landau lacks standing to pursue an injunctive remedy because he is no longer a Viridian customer, and therefore cannot show that he is likely to suffer future injury from Viridian's actions.

The requirements of Article III standing—including an injury-in-fact that is concrete and particularized and actual and imminent—must be satisfied as to each form of requested relief. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). To establish standing to seek injunctive relief, a plaintiff must show that a "real or imminent threat" of harm creates "a likelihood of substantial and immediate irreparable injury." *Id.* at 111.

In *McNair v. Synapse Group Inc.*, the Third Circuit found that lack of standing barred injunctive relief in a putative class action with facts very similar to the present case. 672 F.3d 213 (3d Cir. 2012). *McNair* concerned a suit against Synapse, a company that sold magazine subscriptions in much the same way that Viridian sells electricity service. *Id.* at 216–17. Synapse's practice was to offer introductory promotional subscriptions at greatly reduce rates. *Id.* After the introductory period, these promotional subscriptions would automatically be transformed into regular subscriptions, subject to the normal subscription rates. *Id.* McNair and several other named plaintiffs sued Synapse seeking damages and injunctive relief based on Synapse's alleged failure to warn customers that promotional offers would morph into regular subscriptions. *Id.* at 219. At the time the suit was filed, the named plaintiffs were no longer Synapse customers, having canceled their magazine subscriptions. *Id.* at 224. Synapse therefore

argued that the plaintiffs lacked standing to seek injunctive relief because they were under no threat of future injury based on Synapse's actions. *Id.*

The Third Circuit agreed with Synapse, holding that the plaintiffs had "not established any reasonable likelihood of future injury." *Id.* at 225. In so doing, the court rejected the plaintiffs' argument that "they may, one day, become Synapse customers once more because 'Synapse's offers are compelling propositions.'" *Id.* According to the court, "the law accords people the dignity of assuming that they act rationally, in light of the information they possess." *Id.* Thus, the court found that based on their past bad experiences, the likelihood of plaintiff's resigning with Synapse was remote. *Id.* The court then noted that "[i]f appellants' suggestion is that they may not be able to help themselves when confronted with a really good subscription offer, they still have not provided a basis for standing" because "a lack of self-restraint . . . will not typically invoke jurisdiction of a federal court." *Id.* at 225 n.13.

*McNair* controls the outcome here. As with the named plaintiffs in *McNair*, Landau was no longer a Viridian customer at the time he filed his Complaint. Moreover, Landau's argument for standing—that "Plaintiff will inevitably receive solicitations from Defendant" and may therefore someday conduct business with Viridian again, Resp. at 36—is nearly identical to the one that the Third Circuit rejected in *McNair*. The possibility that Landau might enter a new contract with Viridian despite his prior unhappy experience does not establish a likelihood of future injury sufficient to confer standing. Accordingly, Viridian's Motion to Dismiss is granted as to Landau's claim for injunctive relief.

### e. *Declaratory Relief (Count III)*

In addition to his claims for damages and injunctive relief, Landau brings a claim under Declaratory Judgment Act (DJA), seeking "a declaration of [Viridian]'s obligation . . . under the

agreement regarding the pricing of its electricity."  Compl. ¶ 73.  Viridian argues that Landau's

DJA claim should be dismissed because it is wholly duplicative of his breach of contract claim

and therefore does not advance the litigation.  I disagree.

> In relevant part, the DJA provides that:
>
> In a case of actual controversy within its jurisdiction . . . , any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not
> further relief is or could be sought.

28 U.S.C. § 2201.  Under Rule 57 of the Federal Rules of Civil Procedure, "[t]he existence of

another adequate remedy does not preclude a declaratory judgment that is otherwise

appropriate."  The Advisory Committee Notes to Rule 57 further explain that "declaratory relief

is alternative or cumulative and not exclusive or extraordinary," and that "[w]ritten instruments

. . . may be construed [under the DJA] before or after breach at the petition of a properly

interested party."  Landau is thus free to seek a declaration of Viridian's rights and obligations

under the Agreement.

Nevertheless, the decision to entertain DJA claims is committed to the trial judge's

discretion, and the Third Circuit, in *State Auto Insurances Companies v. Summy*, encouraged

courts to dismiss DJA claims "when doing so would promote judicial economy by avoiding

duplicative and piecemeal litigation."  234 F.3d 131, 133 (3d Cir. 2000).  Although *Summy*

concerned duplicative claims arising in parallel in state and federal court proceedings, in both

*Smithkline Beecham Corp. v. Continental Insurance Co.*, No. CIV.A. 04-2252, 2004 WL

1773713 (E.D. Pa. Aug. 4, 2004), and *Nova Financial Holdings Inc. v. Bancinsure, Inc.*, No.

CIV.A. 11-07840, 2012 WL 1322932 (E.D. Pa. Apr. 17, 2012), judges in this district applied it

to bar duplicative claims in the same cause of action at the federal level.

30

As Viridian points out, Landau seeks a declaration of Viridian's "obligations . . . under the agreement regarding its pricing of electricity."  Compl. ¶ 73.  According to Viridian, "the manner in which to interpret the parties' agreement . . . is necessarily addressed by Plaintiff's breach of contract claim."  MTD at 33.  Viridian therefore asks that I follow *Smithkline* and *Nova Financial* in dismissing Landau's DJA claim.

Unlike the present case, neither *Smithkline* nor *Nova Financial* concerned a putative class action where the DJA claim at issue served as the potential basis for class certification under Rule 23(b)(2).  In declining to entertain the plaintiffs' DJA claim, the court in *Nova Financial* stressed that "Plaintiffs will not suffer prejudice from this ruling."  2012 WL 1322932, at *4.  That is not the case here.  Were I to dismiss Landau's DJA claim, I would effectively extinguish his attempt to certify a class under Rule 23(b)(2), which applies only where a named plaintiff seeks "final injunctive or corresponding declaratory relief."[15]  Because I am unwilling to doom Landau's attempt at class certification at this early stage, Viridian's Motion to Dismiss Landau's DJA claim is denied.

###### B.   Motion to Strike Class Allegations

By way of a separate motion, Viridian asks that I strike Landau's class allegations pursuant to Rule 12(f), Rule 23(c)(1), and Rule 23(d)(1)(D).  Rule 12(f) allows courts to "strike from a pleading any . . . redundant, immaterial, impertinent, or scandalous matter."  Rule 23(c)(1) directs courts to determine "at any early practicable time" whether the proposed class satisfies the class certification requirements.  And Rule 23(d)(1)(D) empowers courts to "eliminate allegations about representations of absent persons."  While a plaintiff in a putative

---

[15] Because Landau does not have standing to pursue injunctive relief, his only means of certifying a class under 23(b)(2) is through declaratory relief.

class action "may generally conduct discovery relevant to class certification," Rules 12 and 23 allow courts to strike class allegations at the pleading stage "if class treatment is evidently inappropriate from the face of the complaint." *Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 615 (E.D. Pa. 2015).

Viridian questions Landau's ability to satisfy the elements of typicality, and commonality essential to class certification.  According to Viridian, variations across its contracts prevent Landau's breach of contract claim from supporting a class action.  Viridian further contends that the oral representations of its Associates are inappropriate for class adjudication because these sales representatives employ widely varying sales pitches.  Landau opposes Viridian's Motion as premature.  He argues that until discovery is allowed to proceed, there will be an insufficient basis to dismiss his class allegations.  I agree.

This is not the exceptional case "when no amount of discovery or time will allow plaintiffs to resolve deficiencies in class definitions under Rule 23." *Id.*  Landau may take discovery to determine the extent to which Viridian's other contracts include assurances of affordability and cost savings that underpin his breach of contract claim.  He may likewise take discovery to establish the uniformity of representations made by Viridian's Associates.  Only after the creation of a factual record will I be able to undertake the requisite "rigorous analysis" into whether "the prerequisites of Rule 23 [have been] met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 161 (1982)).  Viridian's Motion to Dismiss Class Allegations is therefore denied.

**IV.     Conclusion**

Landau's UTCPL claim for injunctive relief, his claim for unjust enrichment, and his claim for breach of the covenant of good faith and fair dealing are all dismissed.  In all other respects, Viridian's Motion to Dismiss is denied.  Viridian's Motion to Strike is also denied.

                                                          _____/s/ Gerald Austin McHugh
                                                          United States District Judge